IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

VINCENT CARTER,

      Plaintiff,

v.

ANTHONY WILLS, LATOYA HUGHES,
JB PRITZKER, KEVIN REICHERT,
JOLEEN KLUMP, FRANK LAWRENCE,
JACOB WILLIAMS, JEROD SCHANZ,
ROBERT GEARHART, KYLE CHOATE,
ANGIE WALTER, JOHN DOE #4, JOHN
DOE #5, and WEXFORD HEALTH
SOURCES, INC.,

      Defendants.

Case No. 24-cv-2265-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff Vincent Carter, an inmate of the Illinois Department of Corrections who is currently incarcerated at Hill Correctional Center, brings this action pursuant to 42 U.S.C. § 1983 for deprivations of his constitutional rights while at Menard Correctional Center. The case is currently before the Court on a motion for summary judgment on the issue of exhaustion of administrative remedies filed by Anthony Wills, Latoya Hughes, Governor JB Pritzker, Kevin Reichert, Joleen Klump, Frank Lawrence, and Jacob Williams (Doc. 80). Carter filed a response in opposition to the motion (Doc. 93).

BACKGROUND

**A. Procedural Background**

On October 1, 2024, Carter filed a Complaint regarding his access to medical care after injuries he sustained in an assault on May 16, 2023 (Doc. 1). Relevant to the issues in

1

Defendants' motion, Carter alleged that he lost partial hearing as a result of his injuries and requested a hearing test from ADA Coordinators Frank Lawrence and Joleen Klump (Doc. 5, p. 3). His requests went unanswered, and he never received a hearing test or assistive device (*Id.*). Carter also alleged that Warden Anthony Wills, IDOC Director Latoya Hughes, and Governor JB Pritzker were aware of the inadequate medical care provided at Menard due to a previous lawsuit, but they all turned a blind eye to the issues at Menard (*Id.* at p. 4). Carter also wrote letters to the officials regarding his inadequate medical care, but those letters were ignored (*Id.*).

In addition to issues with his medical care, Carter took issue with the conditions he experienced at Menard. He alleged Menard was understaffed, leading to issues with healthcare and security (Doc. 5, p. 5). At the time of the assault, Carter alleges he was housed in the East Cellhouse which was unsanitary, understaffed, and dangerous (*Id.*). The cells were overcrowded, holding two inmates—despite being designed for a single occupant—and included inmates with high aggression levels (*Id.*). He alleged Hughes, Wills, Warden Kevin Reichert, and Governor Pritzker were aware of these issues with the cellhouse, as well as lack of access to adequate out-of-cell activity (*Id.*).

After a review of the pleadings pursuant to 28 U.S.C. § 1915A, Carter was allowed to proceed on the following counts:

Count 1:    Eighth Amendment deliberate indifference claim against Angie Walter for failing to provide him with medical care for Carter's broken nose and injured ears.

Count 2:    Eighth Amendment deliberate indifference claim against ADA Coordinators Frank Lawrence and Joleen Klump for failing to provide Carter care and testing for his injured ears.

2

Count 3:        ADA and/or Rehabilitation Act claim against Latoya Hughes (official capacity only) for failing to provide Carter with a hearing test.

Count 4:        Eighth Amendment deliberate indifference claim against John Doe #4 and John Doe #5 for failing to provide Carter with care for his bloody nose.

Count 6:        Eighth Amendment deliberate indifference claim against Wexford Health Sources, Inc. for purposefully understaffing the healthcare unit in order to save money.

Count 7:        Eighth Amendment deliberate indifference claim against Warden Anthony Wills, IDOC Director Hughes, and Governor JB Pritzker for failing to remedy systemic issues with the healthcare unit at Menard Correctional Center.

Count 8:        Eighth Amendment conditions of confinement claim against Warden Wills, IDOC Director Hughes, Warden Reichert, and Governor Pritzker for failing to remedy systemic issues with understaffing, overcrowding, and conditions in the East Cellhouse.

Count 9:        Eighth Amendment failure to protect claim against Kyle Choate, Jerod Schanz, Robert Gearhart, and Officer Jacob Williams for ignoring Carter's concerns regarding his safety in the East Cellhouse.

(Doc. 5, pp. 7-13).

**B. Motion for Summary Judgment**

In their motion for summary judgment, Defendants Wills, Hughes, Governor Pritzker, Reichert, Klump, Lawrence, and Williams argue that Carter failed to exhaust his administrative remedies against them. This includes Carter's claims in Counts 2, 3, 7, 8, and 9. Defendants identified several grievances in the record that they note are relevant to Carter's claims.

### *July 27, 2023 Grievance*

Carter's July 2023 grievance focuses on his lack of safety in Menard's East Cellhouse (Doc. 80-2, pp. 17-18). He complained that he had been assaulted, beaten, and stabbed on multiple occasions. He identified an assault that occurred on July 2, 2023, as well as a prior assault on May 16, 2023 (*Id.*). Carter noted that after the May assault he was placed in restrictive housing, but on June 13, 2023, he was released back to the East Cellhouse (*Id.*). He informed officers that he did not feel safe in the cellhouse after the May assault (*Id.* at p. 18). On either July 5 or 7, Carter wrote to Internal Affairs Officer Jacob Williams about the July 2 attack that took place in the unit's shower (*Id.*). He informed Williams that he was assaulted. He was later interviewed by two internal affairs officers who noted that Carter would be placed on the other side of the East Cellhouse (*Id.*). Carter complained that keeping him in the same building would not make a difference and that his life was still in danger because the two sides shared a bull pen (*Id.*). Carter requested medical attention for his injuries from the assault, the preservation of camera and photo evidence, and a transfer (*Id.* at p. 17).

Although marked as an emergency and signed by Carter on July 30, 2023, the Chief Administrative Officer ("CAO") did not receive the grievance until October 31, 2023 (Doc. 80-2, p. 17). On November 7, 2023, the counselor received the grievance and on November 16, 2023, the counselor responded that the areas identified by Carter as the locations of the assault were monitored by security staff (*Id.*). The counselor noted that there were no incident reports from the alleged assaults and the claims could not be substantiated (*Id.*).

On December 15, 2023, the Administrative Review Board ("ARB") received the grievance (Doc. 80-2, p. 16). The ARB returned the grievance because it was not submitted in the proper time frame. The ARB noted all dates of staff misconduct were outside the 60-day

4

time frame to file a grievance (*Id.*). The ARB further noted that transfers were an administrative decision and the grievance process could not be used to grieve the conduct of other inmates (*Id.*).

Defendants acknowledge that the July 2023 grievance mentions Williams, but argue that it fails to mention Wills, Hughes, Pritzker, Reichert, Klump, or Lawrence. They also argue that it fails to include any allegations regarding medical care for his ear, hearing testing, or systemic issues at the prison with healthcare or conditions. To the extent the grievance mentions Williams, Defendants argue that the ARB rejected the grievance as procedurally defective because it was not submitted in the proper timeframe (within 60 days after the incident at issue).

Carter argues that he submitted this grievance in July but failed to receive a response from his counselor after 60 days (Doc. 93, p. 12). He wrote several letters trying to determine the status of the grievance (*Id.* at pp. 12, 82, 84). His cumulative counseling summary notes that the IDOC director's office received the letter. Although there was no record of the grievance, the entry notes that the counselor was going to come to Carter's cell so that he could submit a new grievance (Doc. 93, p. 14, 64). Carter argues that he followed the grievance process, and it was essentially made unavailable because the July 27, 2023 grievance was lost. When he submitted the second copy, the ARB ultimately returned the grievance, noting that the incident dates were outside of the proper time frame.

### *February 26, 2024 Letter*

In a letter received by the ARB on March 4, 2024, Carter complained that he submitted two grievances (dated June 18, 2023 and October 10, 2023) within the proper time frame and had yet to receive a response from his counselor (Doc. 80-2, p. 11). Carter attached copies of

5

both grievances to the letter (the October grievance is dated October 6, 2023) (*Id.* at pp. 12-15). His June grievance complained about a broken nose that started bleeding again after healthcare staff returned him to his cell (*Id.* at pp. 14-15). The October grievance complained about delays in receiving outside care for his broken nose, requiring a surgical intervention to repair and reset the nose (*Id.* at pp. 12-13). Carter's grievance also mentions leaking fluid from his ears and difficulties with his hearing (*Id.*). On March 21, 2024, the ARB returned the letter and attached grievances, noting that the grievances lacked a response from the counselor, grievance officer, and CAO (*Id.* at p. 10).

*June 18, 2023 Grievance (#K4-1023-1144)*

Carter eventually received a response to his June grievance complaining about his broken nose (Doc. 80-2, pp. 8-9). He claimed that his injury was originally treated and x-rayed but a few hours later his nose started bleeding again (*Id.*). Despite requesting medical care from a nurse and correctional officers, no one would examine his nose (*Id.* at p. 9).

On October 31, 2023, the CAO marked the grievance as an emergency (*Id.* at p. 8). On November 1, 2023, the grievance officer received the grievance and forwarded the grievance to the healthcare unit for review (*Id.* at p. 7). On March 20, 2024, the healthcare unit responded that Carter was sent to an ENT and did not require any further follow-ups (*Id.*). The grievance was deemed resolved (*Id.*). On April 1, 2024, Carter marked the grievance for appeal to the ARB; the ARB received it three days later (*Id.*). The ARB denied the grievance, determining that it was properly handled by the prison (*Id.* at p. 6).

Although fully exhausted, Defendants argue that the grievance neither mentions the defendants nor includes any of the claims in Counts 2, 3, 7, 8, and 9.

6

*March 16, 2024 Grievance (#K4-0424-1775)*

Carter's March grievance noted that on March 12, 2024, he attended an outside follow-up appointment from the surgical repair of his broken nose. The doctor also inquired about Carter's ears, which had previously leaked fluid (Doc. 93, pp. 56-57). Although the doctor noted that Carter's ears were clean, he ordered a hearing test and determined that Carter suffered hearing damage from the assault on May 16, 2023 (*Id*. at p. 57). Carter complained that medical staff at Menard delayed care for his nose for several months, resulting in hearing problems and breathing issues (*Id*.). He requested an investigation into the delay by staff (*Id*.).

On April 11, 2024, the grievance was marked received by the counselor (Doc. 93, p. 56). On May 27, 2025, the counselor responded to the grievance, noting that Carter transferred to Hill Correctional Center on May 14, 2025, and the counselor no longer had access to Carter's medical file (*Id*.). Carter submitted several letters to clinical services inquiring about the status of his grievance (*Id*. at p. 58). After receiving the grievance at Hill, Carter sent the grievance and a letter to the ARB dated August 20, 2025, noting that he received the grievance while at Hill, and he was submitting it to the ARB for review (*Id*. at p. 60). On September 4, 2025, the ARB received the letter and returned the grievance, noting that grievances regarding medical issues should be submitted to an inmate's current facility prior to submitting the grievance to the ARB (*Id*. at p. 62).

Carter argues that after submitting his grievance, he wrote letters inquiring about the status of the grievance (Doc. 93, pp. 10, 58). On June 12, 2024, he submitted a copy of the grievance to the ARB because he had not heard from the counselor (Doc. 80-2, p. 3). The ARB returned the grievance, noting that the grievance was outside of the 60-day timeframe and he should have filed the grievance with his counselor by May 18, 2024 (*Id*. at p. 2). But Carter

7

claims that he never heard from the counselor until he received the grievance back after his transfer to Hill. He notes that he submitted it directly to the ARB after receiving it, but he was told that he needed to submit it first to his current facility (Doc. 93, p. 11).

### *August 3, 2023 Grievance*

Attached to Carter's Complaint is another grievance dated August 3, 2023 (Doc. 1, p. 39). This grievance noted that he was assaulted, which resulted in a broken nose and impaired hearing (*Id.*). Since his diagnosis, he had experienced headaches, difficulty breathing, and popping ears (*Id.*). He noted that he submitted additional grievances but had not yet heard back from the counselor.

After the assault, Carter noted that he no longer felt safe (*Id.* at p. 40). He informed officers but he remained in the same cellhouse. On July 2, 2023, he was again assaulted (*Id.*). After this assault, he was taken to an outside hospital due to understaffing in the prison healthcare unit (*Id.*). Carter noted that the prison is unable to adequately treat his condition due to understaffing (*Id.*).

Carter also complained about safety issues in the prison caused by understaffing (Doc. 1, p. 40). He complained to officers that he did not feel safe after the July assault. He wrote to Internal Affairs Officer Williams about his concerns in the East Cellhouse, which had experienced numerous stabbings. He noted that Warden Wills, Director Hughes, and the Governor knew about the dangers in the East Cellhouse. Carter claimed he wrote the warden, governor, and the director on two occasions about his concerns (*Id.*). He alleged the safety issues led to numerous lockdowns that resulted in delays in his medical care, including care for his nose and a hearing test (*Id.*).

In his request for relief portion of his grievance, Carter stated that he wanted to be transferred and seen by medical staff. He stated that he wanted to be seen by the ADA lady to have his hearing checked (*Id.* at p. 39).

In his responsive brief, Carter notes that he submitted this grievance at the prison but never received a response from his counselor (Doc. 93, p. 21). He also sent a letter to clinical services and the ARB.

## LEGAL STANDARDS

"Summary judgment is proper if the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact such that [the defendant] is entitled to judgment as a matter of law." *Wragg v. Village of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010). Lawsuits filed by inmates are governed by the provisions of the Prison Litigation Reform Act ("PLRA"). 42 U.S.C. §1997e(a). That statute states, in pertinent part, that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* The Seventh Circuit requires strict adherence to the PLRA's exhaustion requirement. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (noting that "[t]his circuit has taken a strict compliance approach to exhaustion"). Exhaustion must occur before the suit is filed. *Ford v. Johnson*, 362 F.3d 395, 398 (7th Cir. 2004). A plaintiff cannot file suit and then exhaust his administrative remedies while the suit is pending. *Id.* Moreover, "[t]o exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). Consequently, if a prisoner fails to properly

utilize a prison's grievance process, "the prison administrative authority can refuse to hear the case, and the prisoner's claim can be indefinitely unexhausted." *Dole*, 438 F.3d at 809.

In *Pavey v. Conley*, 544 F.3d 739, 740-41(7th Cir. 2008), the Seventh Circuit held that "debatable factual issues relating to the defense of failure to exhaust administrative remedies" are not required to be decided by a jury but are to be determined by the judge.[1] Thus, where failure to exhaust administrative remedies is raised as an affirmative defense, the Seventh Circuit set forth the following recommendations:

> The sequence to be followed in a case in which exhaustion is contested is therefore as follows: (1) The district judge conducts a hearing on exhaustion and permits whatever discovery relating to exhaustion he deems appropriate. (2) If the judge determines that the prisoner did not exhaust his administrative remedies, the judge will then determine whether (a) the plaintiff has failed to exhaust his administrative remedies, and so he must go back and exhaust; (b) or, although he has no unexhausted administrative remedies, the failure to exhaust was innocent (as where prison officials prevent a prisoner from exhausting his remedies), and so he must be given another chance to exhaust (provided that there exist remedies that he will be permitted by the prison authorities to exhaust, so that he's not just being given a runaround); or (c) the failure to exhaust was the prisoner's fault, in which event the case is over. (3) If and when the judge determines that the prisoner has properly exhausted his administrative remedies, the case will proceed to pretrial discovery, and if necessary a trial, on the merits; and if there is a jury trial, the jury will make all necessary findings of fact without being bound by (or even informed of) any of the findings made by the district judge in determining that the prisoner had exhausted his administrative remedies.

*Id.* at 742.

---

[1] Recently the United States Supreme Court partially overruled *Pavey* in *Perttu v. Richards*, 605 U.S. 460 (2025). Specifically, the Supreme Court held that "parties are entitled to a jury trial on PLRA exhaustion when that issue is intertwined with the merits of a claim protected by the Seventh Amendment." *Id.* at 479. Here, the issue of exhaustion is not intertwined with the merits of Carter's underlying claims. Thus, *Perttu* is not applicable.

### A. Illinois Exhaustion Requirements

As an IDOC inmate, Carter was required to follow the regulations contained in IDOC's Grievance Procedures for Offenders ("grievance procedures") to properly exhaust his claim. 20 Ill. Administrative Code §504.800 *et seq*. The grievance procedures require inmates to first file their grievance with the counselor within 60 days of the discovery of an incident. 20 Ill. Admin. Code §504.810(a). The grievance form must:

> contain factual details regarding each aspect of the offender's complaint, including what happened, when, where and the name of each person who is the subject of or who is otherwise involved in the complaint. This provision does not preclude an offender from filing a grievance when the names of individuals are not known, but the offender must include as much descriptive information about the individual as possible.

20 Ill. Admin. Code §504.810(c). Grievances that are unable to be resolved through routine channels are then sent to the grievance officer. 20 Ill. Admin. Code §504.820(a). The Grievance Officer will review the grievance and provide a written response to the inmate. 20 Ill. Admin. Code §504.830(a). "The Grievance Officer shall consider the grievance and report his or her findings and recommendations in writing to the Chief Administrative Officer ["CAO"] within two months after receipt of the written grievance, when reasonably feasible under the circumstances." 20 Ill. Admin. Code §504.830(e). "The [CAO] shall review the findings and recommendation and advise the offender of his or her decision in writing." *Id.*

If the inmate is not satisfied with the CAO's response, he or she can file an appeal with the Director through the ARB. The grievance procedures specifically state, "[i]f, after receiving the response of the Chief Administrative Officer, the offender still believes that the problem, complaint or grievance has not been resolved to his or her satisfaction, he or she may appeal in writing to the Director. The appeal must be received by the [ARB] within 30

11

days after the date of the decision." 20 Ill. Admin. Code §504.850(a). The inmate shall attach copies of the Grievance Officer's report and the CAO's decision to his appeal. *Id.* "The Administrative Review Board shall submit to the Director a written report of its findings and recommendations." 20 Ill. Admin. Code §504.850(d). "The Director shall review the findings and recommendations of the Board and make a final determination of the grievance within six months after receipt of the appealed grievance, when reasonably feasible under the circumstances. The offender shall be sent a copy of the Director's decision." 20 Ill. Admin. Code §504.850(e).

The grievance procedures allow for an inmate to file an emergency grievance. In order to file an emergency grievance, the inmate must forward the grievance directly to the CAO who may determine that "there is a substantial risk of imminent personal injury or other serious or irreparable harm to the offender" and thus the grievance should be handled on an emergency basis. 20 Ill. Admin. Code §504.840(a). If the CAO determines the grievance should be handled on an emergency basis, then the CAO "shall expedite processing of the grievance and respond to the offender" indicating to him what action shall be taken. 20 Ill. Admin. Code §504.840(b). If the CAO determines the grievances "should not be handled on an emergency basis, the offender shall be notified in writing that he or she may resubmit the grievance as non-emergent, in accordance with the standard grievance process." 20 Ill. Admin. Code §504.840(c). When an inmate appeals a grievance deemed by the CAO to be an emergency, "the Administrative Review Board shall expedite processing of the grievance." 20 Ill. Admin. Code §504.850(f).

12

## DISCUSSION

Defendants argue that the grievances filed by Carter were procedurally deficient and failed to identify the defendants and the claims against them. In response, Carter argues that the grievance system at Menard was broken. He argues that staff did not make rounds with the grievance box, grievances were ruled on by officials who had professional and personal ties to the staff members who were the subject of the grievances, and grievances were lost or improperly delayed by grievance officials. Carter also argues that he submitted a grievance dated August 3, 2023, which discussed all of his claims and was subsequently lost by grievance officials. Essentially, he argues that he was thwarted in his efforts to exhaust his claims.

The grievance process can become unavailable "if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting." *Dole*, 438 F.3d at 809. There are several situations where the administrative procedure can become unavailable. An administrative remedy may be unavailable when it operates as a dead end, such as when "officers [are] unable or consistently unwilling to provide any relief." *Ross v. Blake,* 578 U.S. 632, 643 (2016). An administrative remedy process may also be so opaque that "it becomes, practically speaking, incapable of use." *Id*. Finally, a prison official can thwart the process through "machination, misrepresentation, or intimidation." *Id*. at 644.

13

It is this last situation that Carter argues made the grievance process unavailable to him.[2] Specifically, he argues that he submitted his August 3 grievance and never received a response. He argues that he submitted letters inquiring about the status of that grievance, but he does not offer any copies of those letters, nor does he note when he submitted them.

Carter does, however, offer evidence suggesting that Menard delayed responses and lost other grievances he filed during the same time period. Carter submitted a grievance on March 16, 2024, regarding treatment for his broken nose as well as issues with his hearing. The grievance was held by Carter's counselor for over a year. It was not returned to Carter until he had transferred to another prison, at which point the counselor indicated she could no longer rule on the grievance because she no longer had access to Carter's medical records. Carter argues that he should have received a response within 14 days under Menard's Grievance Pilot Program. Although failing to meet an aspirational deadline does not necessarily make the grievance process unavailable, at some point the failure to respond makes the process unavailable. *See Ford v. Johnson*, 362 F.3d 395, 400 (7th Cir. 2004) (grievance process available even when response was after the aspirational decision deadline). *Compare with Reid v. Balota*, 962 F.3d 325, 331 (7th Cir. 2020) (noting that unlike the inmate in *Ford*, the inmate in this case failed to receive notice that his grievance was being investigated). Carter includes a letter he wrote to the ARB inquiring about the status of his grievance, but the ARB returned the grievance informing him that it was outside of the 60-day time frame and noting he should have submitted the grievance by May 18, 2024 (Doc. 80-2, 2). The ARB seems to

---

[2] Although Carter argues that the grievance officers favored the staff members identified in the grievances, he has not offered any evidence to support this claim.

14

have ignored the accompanying letter from Carter explaining that the grievance was already submitted to the counselor and he had yet to receive a response (Doc. 80-2, p. 3). Although he eventually received the grievance back over a year later, the counselor failed to provide a response, noting that she no longer had access to Carter's medical file (Doc. 93, p. 56). When he immediately submitted the grievance to the ARB, it was again rejected. This time Carter was directed to submit his grievance regarding his medical issues to his current facility prior to ARB review. Thus, Carter waited over a year and was ultimately presented with conflicting and confusing responses from the ARB regarding the same grievance. Such responses can make the grievance process unavailable. Unfortunately, this grievance did not exhaust any of the claims against Defendants, but it does demonstrate that Carter experienced lengthy delays and confusing responses to his grievances.[3]

Carter also offers evidence that Menard lost his grievances. On July 27, 2023, Carter submitted a grievance about the assault on July 2, 2023, as well as his safety in the East Cellhouse. Carter never received a receipt from his counselor for the grievance. On August 13, 2023, he wrote to clinical services regarding the status of this grievance (Doc. 93, p. 82). His counseling summary indicates that on September 13, 2023, clinical services supervisor Megan Rohlfing received the letter inquiring about both his June 18 and July 27 grievances (Doc. 93, p. 64). She noted that the grievances were never recorded in the log as received by

---

[3] Although he indicates that he learned he suffered hearing loss at a follow-up appointment for his nose surgery and blamed the injury on delays by the medical staff, there are no complaints in the grievance regarding hearing testing at the prison or access to hearing devices. Exhaustion is not intended to provide individual notice to each official who might later be sued, but an inmate must provide enough information to serve the grievance's function of giving "officials a fair opportunity to address [an inmate's] complaint." *Maddox v. Love*, 655 F.3d 709, 722 (7th Cir. 2011); *Turley v. Rednour*, 729 F.3d 645, 649 (7th Cir. 2013). Nothing in the grievance puts officials on notice as to his need for hearing devices, systemic issues at the prison, or safety issues in the East Cellhouse.

the grievance office (*Id.*). To remedy this issue, Rohlfing directed Carter's counselor to instruct him on submitting a new grievance to replace the missing ones (*Id.*). On October 29, 2023, Carter wrote again to Rohling inquiring about the status of his grievance (*Id.* at p. 84).

The grievance was eventually received by the CAO on October 31, 2023; it was deemed not an emergency (Doc. 80-2, p. 17). On November 16, 2023, the counselor returned the grievance (*Id.*). It appears, however, that Carter failed to pursue the grievance through the grievance office at Menard. Instead, the ARB received the grievance December 15, 2023 (*Id.* at p. 16). The ARB returned the grievance, although confusingly not because Carter failed to submit it to the grievance officer (*Id.*). Instead, the ARB noted that dates of staff misconduct were outside the 60-day time frame to file a grievance (*Id.*). The ARB also noted that transfer decisions were made by the administration, and Carter could not grieve another inmate's conduct through the grievance process (*Id.*). But the dates in the grievance were well within 60 days of the July 27 grievance date, and the grievance was not rejected by the prison for being untimely. Further, Carter's grievance dated June 18, 2023, which he also resubmitted after it went missing, was accepted by the ARB (who claimed the grievance was dated October 18, 2023) and was ruled on the merits of the grievance (Doc. 80-2, p. 6).[4] The ARB handled the two grievances in a confusing and contradictory way. And the fact the two grievances initially went missing supports Carter's claim that his grievances were mishandled on numerous occasions.

---

[4] Although the June 18, 2023 grievance was fully exhausted, the grievance fails to exhaust the claims at issue. Carter's June grievance focused solely on treatment for his broken nose after the May 16, 2023, noting that the nose bled for some time after his initial treatment and he was suffering from nose pain, migraines, and a shoulder injury (Doc. 80-2, pp. 8-9). The grievance did not complain about hearing issues or his access to hearing devices, systemic issues at the prison, or safety concerns.

16

Carter's experience with his other grievances supports his claim that he submitted his August 3, 2023 grievance and failed to receive a response. He has, at the very least, established a dispute of fact as to whether he was thwarted in his attempts to exhaust his August 3 grievance. *See Jackson v. Esser*, 105 F.4th 948, 957 (7th Cir. 2024) (when there is a genuine dispute as to whether administrative remedies were available, an evidentiary hearing is required under *Pavey*). Because there is a dispute of fact as to whether Carter was thwarted in his attempts to exhaust his administrative remedies, Defendants' motion for summary judgment must be denied.

CONCLUSION

For the reasons stated above, the motion for summary judgment for failure to exhaust administrative remedies (Doc. 80) is **DENIED**.

On or before **August 11, 2026**, Defendants may file a motion requesting a *Pavey* hearing, if they wish to further pursue their affirmative defense, or a motion withdrawing the affirmative defense of exhaustion, if they do not wish to pursue the affirmative defense. Failure to respond to the Order will be deemed a waiver of the affirmative defense, and this matter will proceed to merits discovery once the issue of exhaustion is resolved as to all defendants.

**IT IS SO ORDERED.**

**DATED:  July 28, 2026**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**